## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | |
|---|---|
| RANDY RUSSELL, and ANTOINETTE RUSSELL, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No. 10-03180-CV-S-GAF ) |
| WHIRLPOOL CORPORATION, | ) ) ) |
| Defendant. | ) |

### ORDER

Presently before the Court is Defendant Whirlpool Corporation's ("Defendant") Motion for Summary Judgment (Doc. # 63), requesting the Court enter judgment as a matter of law as to all claims against Defendant in Plaintiffs Randy Russell ("Mr. Russell") and Antoinette Russell's ("Mrs. Russell") Complaint (Doc. # 1) pursuant to Federal Rule of Civil Procedure 56(c).[1] For the reasons set forth herein, Defendant's Motion is DENIED.[2]

### DISCUSSION

This lawsuit arises out of a fire that occurred at Plaintiffs' residence, 131 Barren Branch Road in Iberia, Missouri, on February 6, 2010. (Complaint). In reliance upon two (2) retained expert witnesses, Plaintiffs contend the fire in question originated from and was caused by a Whirlpool refrigerator located in the kitchen. (*Id*.). The present issues before the Court are whether

---

[1]Mr. Russell and Mrs. Russell are collectively referred to as "Plaintiffs."

[2]Additionally, before the Court are Defendant's Motions to Exclude Plaintiffs' Experts Larry Giggy and Carl Martin. (Docs. ## 61, 65). For the same reasons set forth herein, said motions are DENIED.

1

Plaintiffs properly pled a res ipsa claim regarding defect and whether the opinions of Plaintiffs' expert witnesses are reliable under Federal Rule of Evidence 702.

**I.     FACTS**

**A.     Background**

Plaintiffs' residence was constructed sometime in 2007 or 2008. (Feb. 21, 2011, Deposition of Randy Russell ("Russell Depo."), 37:1-21). Plaintiffs purchased a new Whirlpool refrigerator from Lowe's and immediately installed it into their residence. (Doc. # 73, p. 3).[3] Mr. Russell unpacked the refrigerator from its packaging, connected the icemaker line to the icemaker connection box, and plugged the refrigerator into the refrigerator receptacle in the kitchen, where the refrigerator remained until the fire occurred. (Russell Depo., 93:8-13). No repairs were made to the refrigerator prior to the fire. (*Id.* at 92:22-93:1). Plaintiffs also purchased and installed a new microwave and cooking range in the kitchen around the same time. (Doc. # 73, p. 3; Whirlpool Corporation's First Set of Interrogatories to Plaintiffs ("Defendant First Set of Interrogs.", ¶ 11-12). The fire occurred approximately less than three (3) years after Plaintiffs purchased the refrigerator. (*Id.* at ¶ 4).

Mr. Russell was the general contractor who supervised the construction of Plaintiffs' residence. (Affidavit of Randy Russell ("Russell Affidavit"), ¶ 1). The kitchen electrical outlets were spaced around the kitchen wall along the counter top areas. (Russell Depo., 50:7-11). Only the refrigerator was connected to a 110 volt circuit, separate from a 220 volt circuit, that ran from the service panel to the kitchen. (Russell Affidavit, ¶¶ 1, 2). The refrigerator receptacle was

---

[3]The parties stipulated the refrigerator in question was in the same condition when the Plaintiffs purchased it from Lowe's and when Defendant sold the refrigerator to Lowe's. (*Id.*; *see* February 25, 2011, Letter).

installed forth-eight (48) inches above the finished floor. (*Id.* at ¶ 1). No adaptor or extension cord was used for the refrigerator and Plaintiffs never had problems with the refrigerator outlet tripping the breaker. (Mr. Russell Depo., 93:18-24).

Plaintiffs began hearing an unusual noise coming from the refrigerator days before the fire occurred. (*Id.*, 93: 22-94:1-12). The noise stopped when Plaintiffs unplugged the refrigerator. (*Id.* at 95:19-96:1). Plaintiffs were unable to determine where in the refrigerator the noise was emanating from; however, according to Plaintiffs, it sounded as though the noise was emanating from the freezer area. (*Id.* at 96:18-25).

On February 6, 2010, at approximately 9:00 a.m., Plaintiffs left their home to travel to Cape Girardeau, Missouri, for the day. (Mr. Russell Depo., 32:12-18). The fire in question occurred sometime later that same day. No witnesses to the fire were identified. (July 16, 2010, NCCI Report ("NCCI Report"), p. 10).

Brumley Volunteer Department Fire Fighter Josh Vail ("Vail") was the first person at the scene of the fire. (Doc. # 62, ¶ 6; Feb. 22, 2011, Deposition of Josh Vail ("Vail Depo."), 15:23-25). When Vail arrived, he found more than eighty percent (80%) of the three-story home engulfed in flames and before Vail could put on his fire gear, the entire home had collapsed into the basement. (*Id.*,14:20-15:2).

Multiple fire fighters from the Brumley Volunteer Fire Department and the Iberia Fire Department responded to the alarm. (*Id.*, 18:25-19:25). After approximately ninety (90) minutes, extinguishment efforts ceased and the fire was allowed to burn itself out. (*Id.*, 24:5-25). Lieutenant Training Officer, Tony Smoot ("Smoot"), was in command of the fire at Plaintiffs' residence; he was responsible for calling the State Fire Marshal requesting assistance in investigating the fire cause

3

and origin, if necessary. (Doc. # 62, ¶ 10). Due to the major destruction of the home, the State Fire Marshal was not called because Smoot believed the house was "too far gone" to call the Marshal. (*Id.*; Feb. 22, 2011, Deposition of Tony Smoot ("Smoot Depo."), 16:4-10; 25:13-26:8).

Photographs of the residence before and after the fire reveal the residence and contents therein sustained major destruction. (Doc. # 62, p. 3-4).

**B.     Plaintiffs' Expert Witnesses**

Plaintiffs asserted three (3) causes of action in their Complaint: (1) negligence; (2) breach of warranty; and (3) strict liability. (Complaint, ¶ 7). To support Plaintiffs claims, Larry Giggy ("Giggy") and Carl Martin ("Martin") were retained as expert witnesses to opine as to the origin and cause of the fire in question.

*I.     Larry Giggy*

Giggy was retained to inspect the fire scene and determine origin and cause. (*See* Doc. # 73, p. 8). Giggy is a certified fire investigator within the State of Missouri and was employed by National Claims Consultants & Investigations, LLC ("NCCI") as a fire investigator. (*Id.* at p. 7). On February 10, 2010, Giggy surveyed the fire scene in question. (*Id.* at p. 8). Giggy determined the origin of the fire was in the kitchen at or very near the refrigerator and that the fire progressed from at or near the refrigerator to the kitchen cabinets and "attacked the electric range and microwave that were destroyed but were still left in a recognizable condition." (April 20, 2011, Deposition of Larry Giggy ("Giggy Depo."), 8:4-8; 16-21).

Giggy conducted his investigation by, among other things, interviewing Mr. Russell, examining the perimeter of the fire scene; examining the interior of the fire scene; examining the

4

cooking range, microwave, and refrigerator; examining the service panel of the residence; and documenting the fire scene with photographs. (Doc. # 73, p. 8-9).

In his NCCI report, Giggy ultimately concluded:

> The total destruction of this dwelling made it very difficult to determine the area of fire origin. However, the total destruction of the refrigerator compared to the less damages to the nearby electric range, microwave oven, and other metal items found during the investigation indicated the area of fire origin would be consistent with a fire at or near the refrigerator. Additionally, the heavier fire damage to the left sides of the microwave oven and eclectic range, which were closest to the refrigerator, indicates the fire attacked these appliances from the direction of the refrigerator. The underside of the electric range was relatively free of fire damage, which suggests the fire did not attack this appliance from below. Therefore, the area of the fire origin was determined to be at or near the kitchen refrigerator.

(NCCI Report, p. 11).

To come to this conclusion, Giggy considered and eliminated several possible causes of the fire including careless smoking, intentional fire setting, an open flame, failure of home electronic heating or hot water systems, failure of the "GFI circuit" in the external wood-burning furnace, and "child curiosity fire play." (*Id*. at 11-13). Giggy did not eliminate the refrigerator receptacle and house wiring as causes of the fire. (*See* Doc. # 64, p. 9-10). Moreover, the possibility of failure of an electric appliance could not be eliminated as a cause of fire, and the refrigerator was the appliance that would have been drawing current during the time and was located at or near the origin of the fire. (NCCI Report, p. 13). Accordingly, Giggy ultimately concluded the fire was consistent with a failure of the refrigerator. (*Id*.).

        a.     *NFPA 921 Fire Investigation Methodology*

According to Defendant, Giggy's opinion is fundamentally flawed because Giggy failed to follow a recognized fire investigator treatise: NFPA 921, *Guide for Fire and Explosion Investigation* (2008 ed.) ("NFPA 921"). (Doc. # 62, p. 5; *see* NFPA 921 Guide). NFPA 921 sets forth a process

5

for investigating a fire and establishing the origin and cause of a fire by use of a systematic approach, which utilizes a scientific method to "provide[] for the organizational and analytical process desirable and necessary in successful fire investigation." (NFPA 921 Guide, §§ 4.3.2, 4.2). NFPA 921 cautions against reliance upon appliances to determine area of origin in certain circumstances. (*Id.* at § 24.3.3). Particularly, NFPA 921 cautions against reliance upon appliances constructed of plastic materials in severely distorted or deformed conditions or where combustible material is burned away leaving only wire and other metallic components. (*Id.*).

Giggy ordinarily follows NFPA 921 methodology; however, in certain situations, such as the present case, where there is "nothing to direct" him to an area of origin, Giggy examines the "totality of the circumstances" and the fire artifacts. (Giggy Depo., 29:5-13). As such, in this case, the "only" way Giggy was able to determine the area of origin was to begin his investigation by "looking at the damage to the appliances that [he] found in the basement of the house." (*Id.* at 32: 18-20).

### ii. Carl Martin

Martin was retained to perform a cause and origin investigation and engineering analysis. (April 21, 2011, Deposition of Carl Martin ("Martin Depo.") 122:9-15). Martin was the principal engineer for Engineering Perspective, Inc., and was a registered professional engineer in the States of Missouri, Kansas, Nebraska, and Colorado. (*See* Martin C.V.).

On October 20, 1010, Martin examined the refrigerator in question and reviewed photographs taken at the fire scene. (Martin Depo, 10:5-15). Through his initial examination, Martin concluded:

1. The refrigerator does depict areas of distinguishable heat exposure that would not be expected. There are two independent conditions identified

> that indicate that the fire may have originated from the compressor compartment area. These conditions consisted of the rear metal panel burn patterns and metal thickness variations and the inside surface of the compressor.
>
> 2. Further invasive and destructive examination of the compressor components may provide additional information that could supplement a theory that the fire started in the lower compressor compartment area of the refrigerator.

(October 27, 2010, Carl Martin Report ("October Martin Report"), S-2).

On November 12, 2010, Martin conducted a destructive examination of the electrical service panel and other artifacts removed from the fire scene and conducted a follow-up examination of the refrigerator. (*See* November 18, 2010, Carl Martin Report ("November Report"), S-1-S-2). Martin's examination of the refrigerator compressor revealed that surfaces on the inside of the compressor compartment experienced great heat exposure and that the compressor windings were not energized when the fire impacted the compressor, indicating the compressor was not running at the time of the fire. (*Id*. at S-3). Moreover, Martin discovered that distinguishing and significant heat exposure occurred to the bottom, isolated portions of the compressor shell sidewall. (*Id.*). According to Martin, a fire from an external source that impacts a refrigerator would not cause significant heat exposure to the side wall surfaces of the compressor. (*Id.*). Based on his follow-up and destructive examination of the electrical service panel and artifacts, Martin concluded that "[t]he most likely cause of the fire was an electrical malfunction within the compressor compartment of the refrigerator." (*Id.*).

The factors Martin relied upon include Plaintiffs' reports of unusual sounds emanating from the refrigerator prior to the fire; confirmation the refrigerator was powered at the time of the fire; burn patterns on the refrigerator back panel, revealing significant thinness and separation, which

7

indicate unusual heat exposure to these surfaces; high heat exposure to the stove side panel nearest the refrigerator; confirmation the compressor was not powered at the time the fire impacted the appliance; and areas of unusually intense heat exposure to the compressor exterior and interior surfaces and within the compressor compartment. (*Id.*; Doc. # 75, p. 5).

Martin admitted he was unable to identify a specific component part of the refrigerator that failed and that any damage he observed on the refrigerator could have been the result of the intensity of the fire rather than the cause of the fire. (Martin Depo., 80:16- 81:4; 90:14-25 177:12-15). Additionally, Mr. Martin could not completely exclude the refrigerator electrical receptacle or the house wiring as possible fire sources. (*See id.* at 72:24-4; 76:24-77:7). However, regarding the receptacle, Martin stated it was "really unlikely" that the receptacle was the cause of the fire. (*Id.* at 76: 21-23).

## II. LEGAL STANDARD

Summary judgment should be granted if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). On summary judgment, a district court must view the facts "in the light most favorable to the nonmovant, giving it the benefit of all reasonable inferences to be draw from the facts." *Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990).

"A moving party is 'entitled to judgment as a matter of law' if the nonmoving party fails to sufficiently demonstrate an essential element of a claim" for which the nonmoving party has the burden of proof. *Id.* (quoting and citing *Celotex*, 477 U.S. at 323). The nonmoving party may not

8

merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise show there is a genuine issue for trial. *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002). Summary judgment should not be granted if a reasonable jury could find for the nonmoving party. *Woodsmith Publ'g Co*, 904 F.2d at 1247; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. ANALYSIS

### 1. Res Ipsa Loquituor

The first issue before the Court is whether Plaintiffs properly pled a res ipsa loquituor claim regarding the alleged defect of the refrigerator compressor. Defendant contends Plaintiffs did not plead a res ipsa loquituor claim as to defect, and therefore, Plaintiffs must provide evidence to support a claim of product defect. (Doc. # 78, p. 2).

Absent pleading res ipsa loquitor liability and by pleading specific acts of negligence, a plaintiff is prevented from recovering under a res ipsa theory. *See Dunn v. Nexgrill Industries, Inc.*, 636 F.3d 1049, 1058 (8th Cir. 2011); *see also England v. Downey*, 589 F.2d 374, 377 n. 5 (8th Cir. 2009) ("Res ipsa is applicable only when the plaintiff does not know the cause of the accident. . . .") (internal citation omitted).

"Res ipsa loquitur is an evidentiary doctrine of probabilities, [] and its applicability in a given situation depends upon whether it reasonably may be said that the facts and circumstances raise an inference of defendant's negligence or, otherwise stated, that the accident probably would not have occurred but for defendant's negligence." *Copher v. Barbee*, 361 S.W.2d 137, 146 (Mo. Ct. App. 1962) (internal quotations and citations omitted).[4] When determining the balance of probability, the

---

[4] It is undisputed Missouri law governs this diversity case. (*See* Docs. ## 78, 82).

9

courts may rely upon expert testimony and common knowledge. *Id*. (quotations and citations omitted).

Here, Plaintiffs allege a res ipsa theory regarding defect. Plaintiffs allege generally the fire in question occurred "as a result of a dangerous condition and defect in a refrigeration unit designed, manufactured, and sold by defendant." (Complaint, ¶¶ 5-7). Plaintiffs do not allege specific acts of Defendant's negligence resulting in the alleged defect that caused the fire. The facts and circumstances of a "total-loss" fire in this case and the expert opinions of origin and cause raise a reasonable inference that a defect within the refrigerator compressor existed, and but for Defendant's negligence in designing or manufacturing the refrigerator compressor and its parts the fire would not have occurred. *See Copher*, 361 S.W.2d at 146. Therefore, Plaintiffs may rely upon a res ipsa type theory as to defect based at least upon Martin's testimony, unless it is shown that Martin's opinion is unreliable at a later date.

The Court now turns to the question whether Plaintiffs' expert testimony of origin and cause are reliable under Federal Rule of Evidence 702.

## 2.  Expert Testimony Reliability

Federal Rule of Evidence 702 provides, in pertinent part:

> [A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; *see Fireman's Fund Ins. Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1058 (8th Cir. 2005). The courts have wide latitude in determining whether an expert's testimony is reliable. *Fireman's Fund*, 394 F.3d at 1058 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152

(1999)).  The proponent of expert testimony must prove its admissibility by a preponderance of the evidence.  *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 592 n.10 (1993).

Under Rule 702, the trial judge is a "gatekeeper" screening evidence for relevance and reliability.  *Id.* at 589.  Rule 702 is a rule of admissibility rather than exclusion.  *Lauzon v. Senco Prods., Inc*., 270 F.3d 681, 686 (8th Cir. 2001) (internal quotations and citations omitted).  To determine relevance of expert testimony, the district court reviews said testimony to ensure it is scientifically based and will assist the trier of fact in determining a fact at issue.  *Wood v. Minn. Mining & Mfg. Co.*, 112 F.3d 306, 309 (8th Cir. 1997) (citing *Daubert*, 509 U.S. at 589-90).  "The exclusion of an expert's opinion is proper only if it is so fundamentally unsupported that it can offer no assistance to the jury." *Id.* (internal quotations and citation omitted).

Under Missouri law, a plaintiff in a strict products liability or implied warranty claim must show that the alleged defect caused the claimed damages.  *Pro Serv. Automotive, L.L.C. v. Lenan Corp.*, 469 F.3d 1210, 1214 (8th Cir. 2006) (citing *Hills v. Ozark Border Elec. Coop*., 710 S.W.2d 338, 339 (Mo. Ct. App. 1986) ("Proof that a plaintiff's damages were caused by a defect in the product is an essential element of a plaintiff's case under a product liability theory.").  Expert testimony is not necessarily required in a strict liability action; however, expert testimony is necessary where "the lay jury [does] not possess the experience or knowledge of the subject matter sufficient to enable them to reach an intelligent opinion without help." *Id.* (quoting and citing *Siebern v. Missouri-Illinois Tractor & Equip. Co.*, 711 S.W.2d 935, 939 (Mo. Ct. App. 1986) (internal quotations omitted); *see Tune v. Synergy Gas Corp*., 883 S.W.2d 10, 14 (Mo. 1994) (noting expert testimony is not necessarily required to establish product defect or unreasonable danger).

Evidence pointing equally to a cause for which the defendant is responsible and to one for

11

which the defendant is not responsible is insufficient to make a case for submission to a jury. *Hale v. Advance Abrasives Co.*, 520 S.W.2d 656, 659 (Mo. Ct. App. 1975) (citations omitted). Absent proof of a specific defect, to prove a products liability claim by inference from circumstantial evidence, a plaintiff must offer evidence that:

> (1) tends to eliminate other possible causes of the injury or property damage, (2) demonstrates that the product was in the same basic condition at the time of the occurrence as when it left the hands of the defendants, and (3) the injury or damage is of a type that normally would not have occurred in the absence of a defect in the product.

*Hickerson v. Pride Mobility Prods. Corp.*, 470 F.3d 1252, 1258 (8th Cir. 2006) (citing *Fain v. GTE Sylvania*, 652 S.W.2d 163, 165 (Mo. Ct. App. 1982); *Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 631, 637-38 (8th Cir. 1972).

However, "[a]n inference need not be justified beyond all doubt and is not precluded by a mere possibility that the contrary may be true." *Id.* (quoting and citing *Fain*, 652 S.W.2d at 165) (internal quotations omitted). "[A] case may be submitted to the jury if circumstantial evidence is strong enough to support reasonable inferences necessary to the plaintiff's case free from speculation." *Id.* It is for the jury rather than the court to resolve the factual disputes where multiple inferences may be possible. *Id.*

### I. Giggy's Expert Testimony

Giggy opines the fire originated from at or near the refrigerator. (Doc. # 73, p. 30). Defendant contends Giggy's opinion is unreliable, and, therefore, should be excluded because the opinion is based on insufficient data and information; the opinion as to area of origin is based on an unreliable methodology; Giggy failed to perform testing when forming his opinion; and his opinion

12

did not rule out alternative explanations.[5] (Doc. # 62, p. 20-27). These contentions are primarily grounded in Defendant's assertion that Giggy did not employ NFPA 921 methodology when investigating the origin and cause of the fire. (*See id*.). Particularly, Defendant argues Giggy did not identify an area of origin using NFPA 921 systematic approach, did not perform "arc mapping" to identify an area of origin, did not find any burn patterns suggestive of an area of origin, and did not speak to the fire department personnel or review fire reports. (Doc. #79, p. 2). Thus, Defendant argues, by not using the NFPA 921 methodology, Giggy's investigation began with the improper presumption that the refrigerator was the cause of the fire. (*Id.*).

NFPA 921 methodology is merely a guideline in fire investigations. (*See* NFPA 921 Guide). The NFPA 921 recommends that hypotheses of fire origin be examined against empirical data obtained from fire scene analysis and testing. (*See id.*). Although NFPA 921 methodology may have been recognized as a reliable methodology by courts, contrary to Defendant's argument, such recognition does not signify that NFPA 921 methodology is the only reliable methodology that can be used for fire investigation and cause and origin determination. Utilization of varying scientific methodologies is permissible and may be necessary depending on the circumstances of the fire in question.

To further challenge Giggy's opinion, Defendant relies on *Pro Service*, 469 F.3d 1210. However, *Pro Service* is distinguishable from this case. In *Pro Service*, the Eighth Circuit upheld this Court's decision to exclude the primary expert opinion regarding causation because the

---

[5]Defendant also contends Giggy lacks qualifications to render opinions regarding electrical defect in the refrigerator. (Doc. # 64, p. 5). It is uncontroverted Giggy is not a qualified electrical engineer; rather, Martin was retained to render an opinion regarding electrical defect in the refrigerator. (Doc. # 75, ¶ 3). Accordingly, absent evidence showing otherwise, Giggy may not testify as to electrical defect in the refrigerator in question.

13

purported expert provided no testing or other analysis to support his causation opinion. *See Pro Service*, 469 F.3d at 1215. The purported expert in *Pro Service* failed to provide any evidence demonstrating he employed reliable principles, methods, or applied reliable principles and methods to form his opinion. *Id*. at 1216.

While questions remain concerning Giggy's origin opinion, unlike the *Pro Service* expert, who offered only vague theorizing based upon general principles, Giggy provides evidence of testing and analysis to support his opinion. *Id*. ("Where opinion evidence . . . is connected to existing data only by the *ipse dixit* of the expert, a district court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.") (quoting and citing *Smith v. Cangieter*, 462 F.3d 920, 924 (8th Cir. 2006) (quoting and citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Specifically, Giggy examined burn, heat, and fire pattens of artifacts from the fire scene and eliminated alternative causes to conclude that the origin of the fire was at or near the refrigerator and that the fire was consistent with a refrigerator failure. (*See* NCCI Report, p. 11). Although Giggy did not eliminate the refrigerator receptacle and house wiring, such failures do not render Giggy's opinion so fundamentally unsupported that his opinion is unreliable and inadmissible, especially in light of Martin's opinion, which provides essential support for Giggy's opinion. *See Wood*, 112 F.3d at 309.

### ii. Martin's Expert Testimony

Martin opines that an electrical malfunction within the compressor compartment more probably than not caused the fire. (Doc. # 73, p. 32). Defendant contends Martin's opinion is unreliable, and, therefore, should be excluded because the opinion is not based on sufficient data or information; Martin failed to test his opinion; Martin relied on a "flawed" area of origin

14

determination; and Martin failed to properly eliminate other causes.  (Doc. # 66, p. 2-8).

By examining the refrigerator's rear metal burn pattern, metal thickness variations, and the inside surface of the refrigerator compressor, Martin determined the refrigerator depicted areas of distinguishable heat exposure that would not be expected if the refrigerator was not the cause of the fire.  (Doc. # 73, p. 32).  In coming to his conclusion, Martin eliminated other kitchen artifacts as the cause of the fire based on the burn patterns and damage of those artifacts.  (*Id.*).  For instance, the cooking stove was eliminated as a cause based on burn patterns revealing the left side of the stove, adjacent to the refrigerator, suffered the most significant heat exposure.  (*Id.*).  Further, Martin eliminated other possible sources, such as the electrical service panel and essentially eliminated the refrigerator receptacle, as causes of the fire based on distance from the origin and lack of evidence indicating that the other possible sources caused the fire.  (*Id.*).

The aforementioned evidence of testing and analysis supports Martin's causation opinion.  *Cf. Pro Service*, 469 F.3d at 1216.  Martin examined burn, heat, and fire pattens of artifacts from the fire scene and eliminated alternative causes to conclude the cause of the fire was an electrical malfunction in the refrigerator compressor.  Accordingly, Martin's opinion is scientifically based and will assist the trier of fact in determining facts at issue.  *See Wood*, 112 F.3d at 309.

## **CONCLUSION**

Plaintiffs may attempt to recover under a res ipsa theory regarding the refrigerator compressor defect that allegedly caused the fire in question.  Additionally, although questions remain, especially regarding Giggy's opinion, both Giggy's and Martin's expert opinions are found to be sufficiently reliable pursuant to Federal Rule of Evidence 702 and *Daubert*, at this time.  The evidence demonstrates Giggy's and Martin's opinions are based upon sufficient facts and reliable

15

methods through examination of burn patterns and heat and fire damage to determine origin and cause. As such, to prove their claim of product liability based upon inference from circumstantial evidence without proof of a specific defect, Plaintiffs offer evidence that (1) tends to eliminate other possible causes of the injury or property damage, (2) demonstrates that the product was in the same basic condition at the time of the occurrence as when it left the hands of the Defendant, and (3) the injury or damage is of a type that normally would not have occurred in the absence of a defect in the product. *See Hickerson*, 470 F.3d at 1258 (citations omitted). Accordingly, unless shown otherwise at a later date, this case may be submitted to a jury because the circumstantial evidence is strong enough to support the reasonable inferences necessary to Plaintiffs' case. *See id.* Therefore, Defendant's Motion is DENIED.

**IT IS SO ORDERED.**

s/ Gary A. Fenner  
Gary A. Fenner, Judge  
United States District Court

DATED: September 19, 2011

16

Case 6:10-cv-03180-GAF   Document 87   Filed 09/19/11   Page 16 of 16